IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 07-550-04 |
| ROBERT MERRITT | : | |

**SURRICK, J.**                                                    **JULY _16_, 2014**

### MEMORANDUM

Presently before the Court is Defendant Robert Merritt's Motion for Judgment of Acquittal or, in the Alternative, a New Trial (ECF No. 1534) and Supplemental Post-Verdict Motion for a New Trial Based on Newly Discovered Evidence and on Failure to Provide *Brady* and *Giglio* Material (ECF No. 1567). For the following reasons, Defendant's Motions will be denied.

## I.      BACKGROUND

On May 13, 2013, a jury found Defendant Robert Merritt guilty of conspiring to participate in the affairs of a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) ("RICO conspiracy"). (Verdict Sheet, ECF No. 1330 (filed under seal).) Defendant was found not guilty of six counts of murder in aid of racketeering under 18 U.S.C. § 1959(a)(1), conspiracy to commit murder in aid of racketeering under 18 U.S.C. § 1959(a)(5), and retaliating against a witness under 18 U.S.C. § 1513(a). (*Id.*) Defendant was tried along with three co-Defendants: Kaboni Savage; Steven Northington; and Kidada Savage. Defendant now moves for a judgment of acquittal on the RICO conspiracy count, or in the alternative, a new trial on this count. Defendant contends: (1) that the Government's proof at trial coupled with the Court's jury instructions amounted to a constructive amendment of the Indictment on the RICO conspiracy

count; (2) that the jury verdicts were inconsistent; and (3) that there was insufficient evidence to support the RICO conspiracy conviction.  In addition, in his Supplemental Motion, Defendant seeks a new trial on the basis of newly-discovered evidence.

### A.    The Indictment

The seventeen-count Fourth Superseding Indictment was returned on May 9, 2012, charging Defendant and his co-Defendants with various crimes related to a RICO conspiracy involving drug trafficking, murder, and witness intimidation.  (Fourth Superseding Indictment ("Indictment"), ECF No. 480.)[1]  Count 1 of the Indictment, the RICO conspiracy count, charged all Defendants with conspiring to participate in the affairs of a racketeering enterprise, which is referred to in the Indictment as the Kaboni Savage Organization ("KSO").  The Indictment alleged that from late 1997 through April 2010, the KSO conspired and agreed to commit racketeering acts, including murder, dealing in controlled substances, arson, witness tampering, and money laundering.  (Indictment ¶ 1(a)-(f).)  The Indictment states that Defendants and others were "members of a regional criminal organization" that "maintained control of its drug distributions, and its exclusive control of its drug corners, through a pattern of threats, intimidation, violence, and murder."  (*Id*. at ¶¶ 2, 5.)  The Indictment also states that "[i]t was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the enterprise's affairs."  (*Id*. at ¶ 13.)

The Indictment sets forth the roles that each of the Defendants played with respect to the enterprise, and states that Defendant "was a drug distributor and enforcer for the KSO."  (*Id*. at ¶ 12(b).)  The Indictment further states that Defendant "participated in murders, murder conspiracy, arson, the distribution of controlled substances, carrying firearms during violent

---

[1] On March 11, 2011, the Government filed a notice of intent to seek the death penalty against Defendant and his co-Defendants, Kaboni Savage and Steven Northington.  (*See* ECF Nos. 196, 197, and 198.)

crimes, carrying a firearm during a drug trafficking crime, witness tampering, and witness retaliation." (*Id.*)

The Indictment sets forth 140 paragraphs of overt acts that were allegedly committed by Defendants "[i]n furtherance of the conspiracy, and to effect the objects and purposes" of the conspiracy. (*Id.* at ¶14(1)-(140).) Many of the overt acts describe events involving co-conspirators and Defendant's co-Defendants. The overt acts related specifically to Defendant include the following:

(5) On or about April 5, 2000, in Philadelphia, ROBERT MERRITT possessed with intent to distribute approximately 40 grams of cocaine base ("crack").

(6) On or about July 25, 2000, in Philadelphia, ROBERT MERRITT possessed with intent to distribute cocaine base ("crack").

. . .

(9) On or about June 14, 2000, in Philadelphia, ROBERT MERRITT possessed with intent to distribute cocaine base ("crack").

(10) On or about July 25, 2000, in Philadelphia, ROBERT MERRITT possessed with intent to distribute approximately 11.7 grams of cocaine base ("crack").

. . .

(71) On or about August 8, 2004, in Philadelphia, ROBERT MERRITT possessed a firearm, that is, a loaded Taurus .357 caliber revolver, bearing serial number TA88966, in the area of 9th and Venango Streets.

. . .

(81) On or about October 9, 2004, in the very early morning hours, ROBERT MERRITT traveled from Norristown, Pennsylvania to Philadelphia, to meet with Lamont Lewis.

(82) On or about October 9, 2004, at approximately 5:00 a.m., in Philadelphia, ROBERT MERRITT and Lamont Lewis entered and set fire to the North Philadelphia home of the Coleman family, at 3256 North 6th Street, Philadelphia, Pennsylvania, causing the deaths of: Marcella Coleman, a 54-year

old mother of Eugene Coleman; Tameka Nash, a 33 year-old female; Sean Anthony Rodriguez, a 15-year-old male; Tajh Porchea, a 12-year-old male; Khadijah Nash, a 10-year-old female; and Damir Jenkins, a 15-month-old male infant. The Coleman family's pet dog was also killed in the fire.

. . .

(84) On or about October 9, 2004, in Philadelphia, a telephone call was placed from a telephone used by ROBERT MERRITT to a telephone used by KIDADA SAVAGE.

. . .

(114) On or about January 5, 2005, in Philadelphia, ROBERT MERRITT communicated to KABONI SAVAGE and co-conspirator D.B., telling them that ROBERT MERRITT had been questioned, denying that he had told law enforcement agents anything, and warning KABONI SAVAGE and D.B. not to speak in the presence of potential witnesses.[2]

## B.     The Trial and Conviction

Jury selection for the Fourth Superseding Indictment began on November 7, 2012. Opening statements commenced on February 4, 2013. The guilt phase of the trial lasted approximately fourteen weeks. During the trial, the Government presented over 70 witnesses, over 1000 exhibits, and numerous intercepted Title III wiretap conversations. All of this evidence was used to shape the Government's theory that Defendants, together with other co-conspirators, participated in an overarching RICO conspiracy involving drug distribution, murder, arson, witness tampering, and witness retaliation. Although not all of the evidence and testimony related specifically to Defendant, there was a substantial amount of evidence that permitted the jury to determine Defendant's involvement in the RICO conspiracy. The evidence and testimony as it related to Defendant centered on the October 9, 2004 firebombing of the Coleman residence, and Defendant's drug sales at two drug corners controlled by other KSO associates.

---

[2] Certain of the overt acts listed in the Indictment that involve Defendant were not presented during trial and have not been recited in this Memorandum.

### 1. Firebombing and Murders

On October 9, 2004, Defendant, together with his first cousin, Lamont Lewis, firebombed the home of Eugene Coleman, a former associate of Kaboni Savage and member of the KSO. (April 1, 2013 Trial Tr. 61, 198-217, ECF No. 1377.) Suspicious that Coleman was cooperating with the Government, Kaboni Savage, together with Kidada Savage, solicited and ordered Lewis, who, in turn, solicited Defendant's assistance, in setting fire to Coleman's home. (*Id*.) Lewis was charged in the First Superseding Indictment. The charges against Lewis were disposed of by guilty plea on April 21, 2011. (*See* ECF Nos. 19, 51, 213, 214, 225.) The firebombing took the lives of Coleman's mother, infant son, four other close relatives, and three family pets. (April 10, 2013 Trial Tr. 236-240, ECF No. 1380.) Four of the victims were children ranging in age from 15 years old to 15 months old. At trial, the Government established that the firebombing was ordered by Kaboni Savage, with the assistance of Kidada Savage, to intimidate Coleman from testifying against him at a 2005 drug conspiracy trial. (April 1 Trial Tr. 206-07; April 3, 2013 Trial Tr. 189-190, ECF No. 1378.)

Lewis was portrayed as an assassin or hired gun for the enterprise. Lewis was an important witness for the Government. He testified at trial that he killed eight people on behalf of the enterprise at the direction of Kaboni Savage. (April 1 Trial Tr. 59-61.) In addition to these eight murders, Lewis also murdered three individuals and attempted many other murders. (*Id*. at 62, 66, 69-70, 72, 77.) Lewis, Kaboni Savage, and other KSO members entered into a pact whereby if any of them cooperated with law enforcement, their mothers would be murdered. (April 1 Trial Tr. 174-74.) Defendant often was seen with Lewis, and was familiar with some of the KSO members such as Kaboni Savage and Eugene Coleman. (April 3 Trial Tr. 33-34, 36-37; March 18, 2013 Trial Tr. 180-83, ECF No. 1367.)

On the evening of October 8, 2004, Lewis received an order from Kaboni Savage and Kidada Savage to firebomb the family home of Eugene Coleman in retaliation for Coleman's cooperation in Savage's 2005 federal drug conspiracy trial. (April 1 Trial Tr. 188-89.)[3] At the time, Coleman was incarcerated. Kidada told Lewis to bring someone to help carry out the order. (April 1 Trial Tr. 201, 205.) Lewis told Kidada that he would bring his cousin, Defendant Merritt. (*Id*. at 205.)

At approximately 2:30 a.m., Lewis called Defendant and told him he needed his assistance. (*Id*.; March 28, 2013 Trial Tr. 153-54, ECF No. 1307.) Defendant agreed, and traveled from Norristown to North Philadelphia to meet Lewis at Big Faces Bar at 8th and Venango Streets. (April 1 Trial Tr. 205-06; Gov't's Exs. 948, 949, 951.) There, Lewis told Defendant the plan, and Defendant agreed to help him burn down the Coleman residence. (April 1 Trial Tr. 206-07; April 3 Trial Tr. 33-36.) Defendant was aware that Coleman had been cooperating with the Government against Kaboni Savage in the federal drug conspiracy case. (April 1 Trial Tr. 206; April 3 Trial Tr. 189-90.) Defendant and Lewis purchased two cans of gasoline, and then traveled back to West Philadelphia so that Defendant could retrieve his nine millimeter handgun. (April 1 Trial Tr. 209, 212-13.) They then drove back to North Philadelphia and parked around the corner from the Coleman home. (*Id*. at 214-15.)

At approximately 5:00 a.m., Lewis and Merritt approached the front door of the Coleman residence. (*Id*. at 215; April 9, 2013 Trial Tr. 68-70, ECF No. 1310.) Lewis kicked in the front door, and heard a woman's voice yelling from upstairs, "who's that?" (April 1 Trial Tr. 216.) Lewis fired several shots from Defendant's firearm while Defendant lit and threw the first gas

---

[3] Savage, Northington, and four other co-defendants not charged in the instant Indictment were prosecuted in the 2005 drug conspiracy case before the Honorable Mary A. McLaughlin. After a seven-week trial, Savage was found guilty of conspiracy to manufacture and distribute cocaine, money laundering, firearms possession, witness retaliation, and other crimes. *See United States v. Savage,* No. 04-269 (E.D. Pa.), at ECF No. 716. Coleman testified at that trial.

can into the house, causing it to light on fire.  (*Id.*)  Defendant then threw the second gas can into the home.  (*Id*. at 217.)  Lewis and Defendant fled.  (*Id.*)  As they fled, Lewis heard a woman screaming from inside the Coleman home.  (*Id.*)  Within minutes, the home was engulfed in flames.  (April 9 Trial Tr. 68-69; Gov't's Ex. 903.)  The fire killed six members of the Coleman household, including Eugene Coleman's mother, sister, and infant son.  It was determined that the victims died of smoke and soot inhalation.  (April 17, 2013 Trial Tr. 9-13, ECF No. 1391; Gov't's Exs. 907-913.)  The medical examiner testified that the victims "baked in place" as a result of the high heat caused by the fire.  (April 17 Trial Tr. 10.)  After Defendant and Lewis fled the scene, Lewis called Kidada's phone and left a message notifying her that the order had been carried out.  (April 1 Trial Tr. 217-218.)  Phone records show that approximately five hours after the firebombing, two calls were placed from Kidada Savage's phone to Defendant's phone. (Gov't's Exs. 950-51; April 15, 2013 Trial Tr. 74, ECF No. 1397.)  Lewis testified that, in exchange for Defendant's participation in the firebombing, Defendant received $500 and a car from Lewis.  (April 1 Trial Tr. 223.)

When Defendant was later arrested in 2005 on federal firearm charges, he was placed in a cell at the Federal Detention Center on the same cell block and within earshot of Kaboni Savage and co-conspirator Dawud Bey.  (April 15 Trial Tr. 26-29.)  When Bey asked Defendant whether he spoke with federal authorities about his role in the arson, Defendant responded "I told em nothing . . . I ride."  (April 15 Trial Tr. 57, 66; Gov't's Ex. L1180, L1181.)

While housed at the FDC, Defendant became friends with another inmate named Bienvenido Morales.  (April 8, 2013 Trial Tr. 58-61, ECF No. 1379.)  Defendant told Morales of his involvement in the firebombing, stating that he was the "driver," and that he received money in exchange for his help.  (*Id*. at 73-74.)  He further confided that the arson was committed to

"stop Twin (Eugene Coleman) from testifying and whoever else thought about telling on Kaboni." (*Id*. at 73-74.) Defendant described himself to Morales as a "gun," but indicated that the deaths of the children had affected him, and "had him fucked up in the head." (*Id*. at 77.) Defendant expressed concerns to Morales that Lewis was going to cooperate with law enforcement since Lewis "sometimes gets high on wet and starts running his mouth . . . ." (*Id*. at 76.)

### 2. *Drug Activities*

Evidence and testimony presented at trial also related to Defendant's drug dealings in relation to the KSO. Defendant sold drugs at 8th and Venango Streets, the drug corner exclusively controlled by his cousin, Lewis. (March 18 Trial Tr. 180-81; March 25, 2013 Trial Tr. 35, ECF No. 1369; April 1 Trial Tr. 108; April 3 Trial Tr. 196-98.) Defendant was described by others in or familiar with the KSO enterprise as Lewis's "right-hand man." (May 8, 2013 Trial Tr. 65, ECF No. 1399.) Both men had a tattoo reading "Ride or Die," which revealed their belief that criminal defendants can choose to forego cooperating with law enforcement and remain silent about criminal involvement or else risk death. (April 1 Trial Tr. 184-85; Gov't's. Exs. 985, 959.) Lewis conducted his drug dealings out of a bar located on 8th and Venango called "Big Faces Bar." (April 1 Trial Tr. 96-99; March 18 Trial Tr. 177-79.) Savage helped Lewis obtain control of the block. (April 1 Trial Tr. 99-100.) Others were not permitted to sell drugs on this block without the permission of Lewis. (April 2, 2013 Trial Tr. 69, 239-242, ECF No. 1308.) In July 2004, Defendant was arrested in the vicinity of 8th and Venango for possessing a firearm. (March 12, 2013 Trial Tr. 55-56, ECF No. 1167.) At the time, he was celebrating Lewis's birthday. (*Id*. at 57.) Defendant was charged with possession of a firearm by a convicted felon, and was later convicted of this crime after a jury trial. *See United States v.*

*Merritt*, Crim. No. 05-35-1 (E.D. Pa., Yohn, J.). Defendant received a sentence of 194 months imprisonment for this crime. (Mar 11, 2013 Trial Tr. 177-79, ECF No. 1366; March 12 Trial Tr. 55-57.)

In 2000, Defendant was arrested on three separate occasions for possession of crack cocaine. (Mar. 6, 2013 Trial Tr. 189-191, ECF No. 1363.) Defendant entered pleas of guilty to two of these crimes. (Gov't Ex. 220.) The third arrest resulted in a finding of guilty after a bench trial. (*Id.*) The factual basis supporting the guilty pleas was read into evidence at trial in this case. (Mar. 6, 2013 Trial Tr. 189-202.) Each of the three arrests occurred on the 1300 block of Jerome Street, which was a known drug corner of Mansur Abdullah, a former associate of Kaboni Savage. (March 11, 2013 Trial Tr. 156-160, ECF No. 1366; March 4, 2013 Trial Tr. 210-22, ECF No. 1165; Gov't Exs. 217, 220.) Abdullah, also known as "Shafiq," controlled the drug sales and was the drug supplier on the 1300 block of Jerome Street at the time of Defendant's arrests in 2000. (March 4 Trial Tr. 201-11.) Abdullah was later murdered, a crime that was separately charged against Kaboni Savage in the instant case and served as a predicate racketeering act for the overarching RICO conspiracy. (Indictment 11, 40-41.) Abdullah had drug dealings with Kaboni Savage and learned the process of cocaine recompression from Savage. (Feb. 28, 2013 Trial Tr. 115-16, ECF No. 1164; March 4 Trial Tr. 165-66, 195.)

### C. Procedural History

#### 1. *Proposed Jury Instructions*

On March 8, 2013, an amended order was entered providing the parties additional time to submit proposed jury instructions. (ECF No. 1150.) On March 25, 2013, the day that the proposed jury instructions were due, Defendant filed a request for additional time to prepare jury instructions related to the RICO conspiracy count. (ECF No. 1195.) In this pleading, Defendant

indicated that the Third Circuit model jury instructions on RICO conspiracy are "unnecessarily confusing" because they inform the jury that the government is not required to prove that the enterprise actually existed, or that the defendant was actually employed by or associated with the enterprise. (*Id.*) On April 1, 2013, Defendant filed a proposed jury instruction on the RICO conspiracy count. (ECF No. 1212.)

On April 25, 2013, the Court held a charging conference in Chambers. At that time, the parties discussed the issues raised by Defendant with respect to the RICO conspiracy charge.

On May 6, 2013, the Court charged the jury. After instructing the jury on the elements necessary to convict any of the Defendants of RICO conspiracy, the Court stated:

> Ladies and Gentlemen, the Government is not required to prove that the alleged enterprise was actually established, that the defendant was actually employed by, or associated with the enterprise, that the defendant was actually engaged in or its activities actually affected interstate or foreign commerce, or that the defendant actually committed any racketeering act.
>
> To find Kaboni Savage, Robert Merritt, Steven Northington, or Kidada Savage guilty of RICO conspiracy charged in Count 1, ladies and gentlemen, you must find that the defendant . . . joined the agreement or conspiracy with another person or persons knowing that the objective or purpose was to conduct or to participate directly or indirectly in the conduct of the affairs of an enterprise through a pattern of racketeering activity and intending to join with the other person or persons to achieve that objective.

(May 6, 2013 Trial Tr. 53-54, ECF No. 1398.)

### 2. *Jury's Verdict*

On May 13, 2013, the jury returned its verdict. The jury found Defendant guilty of RICO conspiracy (Count 1). The jury found Defendant not guilty of conspiracy to commit murder in aid of racketeering (Count 9), not guilty of murder in aid of racketeering (Counts 10-15), and not guilty of retaliating against a witness (Count 16).[4] Because Defendant was acquitted on all of

---

[4] Defendant was also charged in Count 17 with using fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1). The verdict slip advised the Jury that they should only deliberate on

the death-eligible counts, he did not proceed to a penalty phase hearing.  Defendant is presently awaiting sentencing.[5]

As part of their verdict, the jury made special findings in accordance with *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  These findings were required to determine the potential maximum sentence Defendant faced for the RICO conspiracy conviction.  With regard to the murders of the Coleman family members, the jury found unanimously, beyond a reasonable doubt, that the following sentencing factors were proven as to Defendant:

> Special Sentencing Factors #9 through #14:  The Coleman Family Murders
>
> On or about October 9, 2004, in Philadelphia, in the Eastern District of Pennsylvania, the defendants, KABONI SAVAGE, ROBERT MERRITT, and KIDADA SAVAGE, knowingly and intentionally murdered, knowingly aided and abetted, and willfully caused the murder of, and aided, agreed, or attempted to aid, and solicited another to commit, the murders of Marcela Coleman (sentencing factor #9), Tameka Nash (sentencing factor #10), Sean Anthony Rodriguez (sentencing factor #11), Tajh Porchea (sentencing factor #12), Khadijah Nash (sentencing factor #13), and Damir Jenkins (sentencing factor #14), human beings, all in violation of the laws of the Commonwealth of Pennsylvania, that is, Title 18, Pennsylvania Consolidated Statutes Annotated, Sections 2502(a) and 306.

(Verdict 8.)

---

Count 17 if Defendant was found guilty of the underlying felony, murder in aid of racketeering. The jury did not deliberate on Count 17 because they found Defendant not guilty of murder in aid of racketeering.

[5] Kaboni Savage was found guilty on all counts:  RICO conspiracy; twelve counts of murder in aid of racketeering; conspiracy to commit murder in aid of racketeering; witness retaliation; and using fire to commit a felony.  (Verdict Sheet.)  After a penalty phase hearing, on June 3, 2013, the same jury that determined his guilt sentenced Kaboni Savage to death on each of the thirteen death eligible counts.  (*See* Min. Entry, ECF No. 1443; Savage Penalty Verdict, ECF No. 1434.)  Northington was found guilty of RICO conspiracy and two counts of murder in aid of racketeering.  (Verdict.)  On June 19, 2013, after a penalty phase hearing, the jury sentenced Northington to life in prison without the possibility of release.  (*See* Min. Entry, ECF No. 1485; Northington Penalty Verdict, ECF No. 1466.)  Kidada Savage was found guilty of RICO conspiracy, six counts of murder in aid of racketeering, retaliating against a witness, and using fire to commit a felony.  She was sentenced on February 21, 2014 to a statutory maximum penalty of life imprisonment.  (ECF Nos. 1555, 1556.)

The jury made two other findings with respect to Count 1. Specifically, they determined that the following special sentencing factors were not proven as to Defendant:

Special Sentencing Factor #1: The Drug Distribution Conspiracy

From a time at least as early as in or about late 1997 to on or about August 16, 2007, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, the defendants, KABONI SAVAGE, ROBERT MERRITT, STEVEN NORTHINGTON, and KIDADA SAVAGE, knowingly and intentionally conspired and agreed to distribute, and to possess with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, 280 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack"), heroin, marijuana, or one kilogram or more of a mixture or substance containing a detectable amount of phencyclidine (PCP); all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.
[As to each defendant, the jury must be unanimous as to whether 5 kilograms or more of cocaine, 280 grams or more of cocaine base ("crack"), 1 kilogram or more of PCP, or any combination of those threshold amounts, was involved in conspiracy and foreseeable to that defendant.]

(Verdict 2-3.)

Special Sentencing Factor #15: Witness Retaliation Resulting in the Coleman Family Murders

On or about October 9, 2004, in Philadelphia, in the Eastern District of Pennsylvania, the defendants, KABONI SAVAGE, ROBERT MERRITT, and KIDADA SAVAGE, killed, and aided and abetted the killing of, Marcella Coleman, Tameka Nash, Sean Anthony Rodriguez, Tajh Porchea, Khadijah Nash, and Damir Jenkins, with the intent to retaliate against another person, namely Eugene Coleman, for the attendance of Eugene Coleman as a witness at an official proceeding, that is, grand jury testimony, for testimony given by Eugene Coleman to a federal grand jury, and for Eugene Coleman's providing to law enforcement officers information relating to the commission of federal offenses, that is conspiracy to distribute controlled substances, money laundering, and firearms offenses, as charged by the indictment against Kaboni Savage and others in the United States District Court for the Eastern District of Pennsylvania; all in violation of Title 18, United States Code, Sections 1513, and 2.

(Verdict 9.)

### 3. *Motion for Judgment of Acquittal*

On September 16, 2013, Defendant filed the instant Motion for Judgment of Acquittal, or in the Alternative, a New Trial. (Def.'s Mot., ECF No. 1534.) On September 25, 2013, the Government filed a Response in opposition to the Motion. (Gov't's Resp., ECF No. 1537.) On October 10, 2013, Defendant filed a Reply. (Def.'s Reply, ECF No. 1545.)

### 4. *Motion for New Trial*

On May 15, 2014, months after Defendant filed the instant Motion, his counsel sent a letter to the Court raising an additional basis for post-verdict relief. Defendant contends that a Philadelphia Police Department ("PPD") investigation revealed misconduct on the part of former PPD Officer Jeffrey Cujdik, the arresting officer for Defendant's April 5, 2000 arrest for possession with intent to distribute ("PWID"). Defendant contends that this constitutes "newly discovered evidence" that warrants a new trial under Rule 33 of the Federal Rules of Criminal Procedure. Specifically, Defendant claims that, after reading an article published in the Philadelphia Inquirer, he learned that Cujdik was found to have "fabricated evidence in a search warrant, routinely gave improper gifts and loans to confidential informants, and lied to cover up his misconduct." (Def.'s May 15, 2013 Ltr. (on file with Court).) Defendant contends that this finding of misconduct calls into question the validity of his 2001 conviction, and the use of that conviction as an overt act in support of the RICO conspiracy charge against him. Multiple letters were then exchanged between counsel for Defendant and counsel for the Government. (*See* Gov't's May 29, 2014 Ltr; Def.'s June 9, 2014 Ltr.; Gov't's June 13, 2014 Ltr.; Def.'s June 16, 2014 Ltr.; Gov't's June 17, 2014 Ltr. (all on file with Court).)[6]

---

[6] A more in-depth description of the facts surrounding Defendant's basis for a new trial is discussed *infra* at Section IV.

On June 10, 2014, Defendant filed his Supplemental Post-Verdict Motion for a New

Trial based on Newly Discovered Evidence and on the Government's Failure to Provide *Brady*

and *Giglio* Material.  (Def.'s Supp. Mot., ECF No. 1567.)  On July 1, 2014, the Government filed

a Response in opposition to Defendant's Motion.  (Gov't's New Trial Resp., ECF No. 1568.)

On July 8, 2014, Defendant provided the Court with courtesy copies of two documents

that he filed in his other criminal cases.  The first is a Petition for Post-Conviction Relief, which

was filed in the Philadelphia Court of Common Pleas on June 23, 2014.  The Petition seeks to

overturn his conviction for PWID that resulted from Cujdik's April 5, 2000 arrest of Defendant.

*See Commonwealth v. Merritt*, Crim. No. 0514931-2000 (Ct. Com. Pleas, Phila. Cnty.).  The

second document is a Motion to the Third Circuit Court of Appeals, filed on June 30, 2014,

which seeks an order authorizing the District Court that heard his federal firearms case to

consider a second habeas petition.[7]  *See United States v. Merritt*, No. 05-35 (3d Cir.).  In the

proposed second habeas petition, Defendant challenges the enhanced sentence he received as a

result of the prior narcotics conviction involving Cujdik.

## II.    LEGAL STANDARD

Defendant seeks a judgment of acquittal under Rule 29 of the Federal Rules of Criminal

Procedure, or in the alternative, a new trial under Rule 33.  Rule 29 provides that "[i]f the jury

has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  Fed. R.

Crim P. 29(c)(2).  When considering motions for judgment of acquittal, the court must view the

evidence in the light most favorable to the prosecution, and must uphold the verdict provided that

any rational trier of fact could have found guilt beyond a reasonable doubt given the available

evidence.  *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).  District courts "must be

---

[7] Under 28 U.S.C. § 2244, "[a] second or successive [Section 2255] motion must be
certified . . . by a panel of the appropriate court of appeals."

ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Id.* Motions under Rule 29 are judged under a "highly deferential standard." *United States v. Carbo*, 572 F.3d 112, 119 (3d Cir. 2009). Challenges to the sufficiency of the evidence supporting a jury verdict "should 'be confined to cases where the prosecution's failure is clear.'" *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002) (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1994)). Defendant bears the burden of proving that the Government's evidence was insufficient to convict. *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990).

Rule 33 permits a court to vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). When considering a Rule 33 motion, "the court may weigh the evidence, but may set aside the verdict and grant a new trial only if it determines that the verdict constitutes a miscarriage of justice, or if it determines that an error at trial had a substantial influence on the verdict." *United States v. Parrott*, No. 09-245, 2010 U.S. Dist. LEXIS 20613, at *6 (E.D. Pa. Mar. 4, 2010) (quotation omitted). "A new trial is required on the basis of evidentiary errors only when the 'errors, when combined, so infected the jury's deliberation that they had a substantial influence on the outcome of the trial.'" *Id.* (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)). Rule 33 Motions should be "granted sparingly and only in exceptional cases." *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987).

## III.     MOTION FOR JUDGMENT OF ACQUITTAL

Defendant makes three arguments in support of his request that the Court vacate his RICO conspiracy conviction: (1) that the jury instructions on RICO conspiracy amounted to a

constructive amendment of the Indictment; (2) that the jury's verdict on the RICO conspiracy count is inconsistent with the jury's acquittal on the conspiracy to commit murder in aid of racketeering count; and (3) that there was insufficient evidence to convict him of RICO conspiracy.

### A.  Constructive Amendment of the Indictment

Defendant argues that the Government's proof at trial, together with the Court's jury instructions, constructively amended the Indictment by permitting the jury to return a guilty verdict based upon a theory of guilt that Defendant claims was neither alleged in the Indictment nor argued at trial.  Specifically, Defendant contends that the Indictment alleges that Defendant is a member of the racketeering enterprise known as the KSO, and that, as a member, he assumed a particular role in the enterprise.  Defendant further contends that the Government's theory during trial was that Defendant was in fact a member of the KSO, and that he committed certain racketeering acts in furtherance of the KSO's purpose.  Defendant argues that, despite this characterization in the Indictment and at trial that Defendant was a KSO member, the jury instructions allowed Defendant to be convicted of RICO conspiracy without the jury determining that the enterprise actually existed and that Defendant was a member of the enterprise.  The result, according to Defendant, was a constructive amendment of the Indictment.

The Fifth Amendment provides in relevant part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]"  U.S. Const. amend V.  "Because of this constitutional guarantee, 'a court cannot permit a defendant to be tried on charges that are not made in the indictment against him.'"  *United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010) (quoting *Stirone v. United States*, 361 U.S.

212, 217 (1960)).  The general prohibition against constructive amendments to indictments

derives from this Fifth Amendment guarantee.  *Id.*

"An indictment is constructively amended when, in the absence of a formal amendment,

the evidence and jury instructions at trial modify essential terms of the charged offense in such a

way that there is a substantial likelihood that the jury may have convicted the defendant for an

offense differing from the offense the indictment returned by the grand jury actually charged."

*United States v. Daraio*, 445 F.3d 253, 259-60 (3d Cir. 2006).  When considering a claim for

constructive amendment, "'[t]he key inquiry is whether the defendant was convicted of the same

conduct for which he was indicted.'"  *Daraio*, 445 F.3d at 260 (quoting *United States v. Robles-

Vertiz*, 155 F.3d 725, 729 (5th Cir. 1998)).  "If a defendant is convicted of the same offense that

was charged in the indictment, there is no constructive amendment."  *Vosburgh*, 602 F.3d at 532.

Thus, "'convictions generally have been sustained as long as the proof upon which they are

based corresponds to an offense that was clearly set out in the indictment.'"  *United States v.

Asher*, 854 F.2d 1483, 1498 (3d Cir. 1988) (quoting *United States v. Miller*, 471 U.S. 130, 136

(1985)).[8]

There was no constructive amendment here.  Defendant was clearly charged with RICO

conspiracy, and he was convicted of RICO conspiracy.  The Indictment specifically charged

Defendant with conspiracy to participate in a racketeering (RICO) enterprise, in violation of 18

U.S.C. 1962(d), and explicitly alleged that Defendant "conspired and agreed, with [the other

Defendants] . . . and with others known and unknown to the grand jury, to violate Title 18,

United States Code, Section 1962(c), that is, to knowingly and unlawfully conduct and

---

[8] In contrast to a constructive amendment, a variance occurs "where the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment."  *Daraio*, 445 F.3d at 261 (quotation omitted).  Defendant does not allege that a variance occurred here.

participate, directly and indirectly, in the conduct of the affairs of [the] enterprise through a pattern of racketeering activity . . . ." (Indictment ¶ 1.) The Government's proof at trial and the Court's jury instructions were consistent with the course of conduct charged in the Indictment. After fourteen weeks of hearing evidence and testimony, the jury found Defendant guilty of the same RICO conspiracy that was alleged in the Indictment. Accordingly, he was "convicted of the same offense that was charged in the indictment," the result of which is that "there [was] no constructive amendment." *Vosburgh*, 602 F.3d at 532. Defendant's argument to the contrary is fundamentally flawed for multiple reasons.

Defendant's argument is rooted in a false assumption about the crime of RICO conspiracy. Defendant argues that the Court should have instructed the jury that, to convict Defendant of RICO conspiracy, they must first find, unanimously and beyond a reasonable doubt, that an enterprise existed, and that Defendant was a member of, was employed by, or was associated with that enterprise. This is an erroneous statement of RICO conspiracy law. The Third Circuit Model Jury Instructions, which the jury instructions in this case tracked, make clear that:

> [i]n order to find [the defendant] guilty of the RICO conspiracy . . . the government is not required to prove that the alleged enterprise actually existed, or that the enterprise actually engaged in or its activities affected interstate or foreign commerce.
>         . . .
> In order to find [the defendant] guilty of the RICO conspiracy . . . the government is not required to prove that [the defendant] was actually employed by or associated with the enterprise, or that [the defendant] agreed to be employed by or to be associated with the enterprise.

Third Circuit Model Jury Instruction 6.18.196D. The commentary provided with this model instruction refers to the Supreme Court opinion, *Salinas v. United States*, 522 U.S. 52 (1997). In *Salinas*, the Court held that a RICO conspiracy under 18 U.S.C. § 1962(d) does not require proof

that a defendant personally committed or agreed to personally commit the substantive RICO offense, or any specific element of that offense.  *Id*. at 63.  The Court stated that the RICO conspiracy statute is to be interpreted in light of the common law of criminal conspiracy, and that as a result, it "suffices that [the defendant] adopt the goal of furthering or facilitating the criminal endeavor."  *Id*. at 65; *see also Smith v. Berg*, 247 F.3d 532, 537 (3d Cir. 2001) (adopting broad application of conspiracy law to RICO conspiracy analysis).

It follows then that the elements necessary to establish a RICO substantive offense under 18 U.S.C. § 1962(c), such as, the existence of an enterprise, and a defendant's employment by, or association with that enterprise, are not necessary to establish a RICO conspiracy offense.  Rather, RICO conspiracy requires an agreement.  It requires proof "that the conspirators share[d] a common purpose."  *Berg*, 247 F.3d at 537 (citing *Salinas*, 522 U.S. at 64); *cf United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) (quotations omitted) (stating that the "essence of a conspiracy is an agreement to commit an unlawful act" and "[t]hat agreement is a distinct evil which may exist and be punished whether or not the substantive crime ensues").  This principle underlying RICO conspiracy law is well-established.  *See United States v. Applins*, 637 F.3d 59, 75 (2d Cir. 2011) (concluding that establishing the existence of an enterprise is not an element of the RICO conspiracy offense); *United States v. Jones*, No. 05-322, 2007 U.S. Dist. LEXIS 34772, at *17-18 (N.D.N.Y. May 11, 2007) (rejecting the defendant's argument that the government failed to present sufficient evidence that he was "employed by or associated with the [RICO] enterprise" since such proof is not required to be convicted of RICO conspiracy); *United States v. Harris*, No. 07-10143, 2009 U.S. Dist. LEXIS 108844, at *36-37 (D. Kan. Nov. 20, 2009) (explaining that proof of the actual existence of an enterprise is not required for RICO conspiracy charges, in the same way that proof of the commission of overt acts in furtherance of

the conspiracy is not required); *United States v. Larson*, No. 07-304, 2011 U.S. Dist. LEXIS 139357, at *13-15 (W.D.N.Y Dec. 5, 2011) (rejecting argument that jury instructions permitted the jury to convict the defendant of RICO conspiracy without a finding that an enterprise actually existed and holding that proof of an enterprise is not required for a RICO conspiracy conviction).

Defendant's proposed jury instruction, if used, would have informed the jury that a RICO conspiracy could only be found if the Government established beyond a reasonable doubt that an enterprise existed and that Defendant was employed by or associated with that enterprise. This proposed instruction is contrary to established RICO conspiracy law. Jury instructions "must inform the jury of the correct legal standard." *Harvey v. Plains Twp. Police Dept.*, 635 F.3d 606, 612 (3d Cir. 2011) (vacating conviction and remanding case for new trial where jury instructions contained misstatements of the law). Had the Court instructed the jury in accordance with Defendant's request, the charge would have improperly provided an inaccurate standard for the crime of RICO conspiracy. *See Applins*, 637 F.3d at 75 (concluding that the jury instructions for a RICO conspiracy charge were erroneous because they contained a statement that the Government was required to prove the existence of an enterprise). Instructing the jury that the crime of RICO conspiracy contains elements that neither the RICO statute nor the case law require would result in a miscarriage of justice. *See Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 124 (3d Cir. 1999) (finding that the court's instructions failed to provide proper guidance on a fundamental question, which resulted in a miscarriage of justice).

A recent Second Circuit case, *United States v. Applins*, 637 F.3d 59 (2d Cir. 2011), illustrates this point. In *Applins*, a case involving facts similar to the instant case, the Second Circuit addressed challenges to jury instructions in a RICO conspiracy case. The indictment in *Applins* alleged that the defendants were "members and associates of a criminal organization . . .

known as Elk Block, whose members and associates engaged in murders, attempted murders, drug trafficking, witness tampering, and other crimes." *Applins*, 637 F.3d at 63 (footnote omitted). The indictment also stated that the Elk Block members and associates constituted an "enterprise" as the term is defined in 18 U.S.C. § 1961(4), and that the members "conspired to participate in the affairs of the Elk Block enterprise through a pattern of racketeering activity." *Id*. Similar to the Indictment in this case, the *Applins* indictment stated that "the defendants . . . together with others known and unknown to the grand jury, [were] persons employed by or associated with the enterprise known as Elk Block." *Id*. The district court instructed the jury that to convict the defendant of RICO conspiracy, they must find that "an enterprise would be established," and that "the defendant would be employed by or associated with the enterprise." *Id*. at 72. The district court also gave the following instruction:

> To convict each defendant on the RICO conspiracy offense charged in Count I, the Government is not required to prove that the alleged enterprise was actually established, that the defendant was actually employed by or associated with the enterprise, or that the enterprise actually engaged in or its activities actually affected interstate or foreign commerce. Rather, because the agreement to commit a RICO offense is the essence of a RICO conspiracy offense, the Government need only prove that if the conspiracy offense were completed as contemplated, the enterprise would be established, that the defendant would be employed by or associated with the enterprise, and that the enterprise would be engaged in or its activities would affect interstate or foreign commerce.

*Id*. Relying on *Salinas*, the Second Circuit determined that, because RICO conspiracy does not require proof that the substantive offense was committed, "the establishment of an enterprise is not an element of the RICO conspiracy offense." *Id*. at 74-75. The court determined that the first part of the district court's instruction, which required proof of the existence of an enterprise—an instruction requested by the defendants—was erroneous because RICO conspiracy does not contain this element. *Id*. at 75. As in *Applins*, had we instructed the jury that, to find Defendant guilty of RICO conspiracy, they must first find that an enterprise existed,

and that Defendant was employed by or associated with the enterprise, our instruction would have been erroneous.

In other words, "enterprise" and "association or employment" with that enterprise are not "essential terms" for the charge of RICO conspiracy. *Salinas*, 522 U.S. at 66 (holding that the elements of RICO conspiracy are (1) knowledge of the enterprise's activities, and (2) an agreement to facilitate the scheme); *see also* Third Circuit Model Jury Instruction 6.18.196D. Therefore, the evidence and jury instructions did not "modify *essential terms* of the charged offense." *Daraio*, 445 F.3d at 259 (emphasis added).[9]  At the heart of a RICO conspiracy charge

[9] Even if the Third Circuit considered enterprise and association with, or employment by, the enterprise to be essential terms of a RICO conspiracy charge, we are satisfied that, in this case, there could not have been "a substantial likelihood that the jury may have convicted [the] Defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *Daraio*, 445 F.3d at 259.  The jury determined that the KSO enterprise existed because the existence of an enterprise is a requirement for the VICAR murders charged in Counts 10-15, and Defendants Kaboni Savage and Kidada Savage were both found guilty of these charges.  (Verdict; May 6 Trial Tr. 105-106).  In addition, there was ample evidence at the trial showing that Defendant was "associated with" the enterprise.  "For the purposes of RICO, the threshold showing of 'association' is not difficult to establish; it is satisfied by proof that the defendant was 'aware of at least the general existence of the enterprise named in the indictment.'" *United States v. Parise*, 159 F.3d 790, 796 (3d Cir. 1998) (quoting *United States v. Eufrasio*, 935 F.2d 553, 577 n.29 (3d Cir. 1991)); *see also United States v. Console*, 13 F.3d 641, 653 (3d Cir. 1993).  The evidence showed that Defendant committed the firebombing of the Coleman residence with knowledge of its purpose to help Kaboni Savage and deter Coleman and others from testifying against Savage and the KSO.  In addition, Defendant sold drugs under the supervision and protection of, his cousin Lamont Lewis, knowing that Lewis was a KSO associate closely linked to Kaboni Savage.  This evidence permitted a jury to find that Defendant was aware of the general existence of the enterprise.  His conversations at the FDC with Kaboni Savage and Dawud Bey—where he assured them that he would "ride" instead of disclose information about the arson murders to the federal authorities—supports this knowledge. Defendant may not have been "in the inner circle" of the KSO and may have been "more on the periphery," as suggested by the Government during trial (April 29, 2013 Trial Tr. 12-13; 24, ECF No. 1394), but this does not mean that he could not have been found by the jury to be associated with the enterprise. *See United States v. Elliot*, 571 F.2d 880, 903 (5th Cir. 1978) ("[T]he RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise.  This effect is enhanced by principles of conspiracy law also developed to facilitate prosecution of conspirators at all levels.").

Defendant argues that the jury must have determined that he was not associated with the KSO enterprise because it acquitted him of the VICAR murders, but found the special sentencing

is the defendant's *agreement* to commit a substantive RICO offense. The Indictment clearly

described Defendant's agreement. The fact that the Indictment contained additional background

information describing the enterprise, the existence of which the Government sought to prove in

order to meet its burden for the VICAR murder charges, does not alter the essential elements of

the RICO conspiracy charge. Nor does it suggest that Defendant was convicted of a different

offense than the one with which he was charged. *Cf. Miller*, 471 U.S. at 136 ("As long as the

crime and the elements of the offense that sustain the conviction are fully and clearly set out in

the indictment, the right to a grand jury is not normally violated by the fact that the indictment

alleges more crimes or other means of committing the same crime.").

The Court's instruction to the jury on the crime of RICO conspiracy was consistent with

both the RICO conspiracy statute and the conduct charged in the Indictment.[10] This congruence

precludes a finding that a constructive amendment has occurred here. *See United States v. Wills*,

---

factors with regard to these murders proven. Defendant's argument ignores a critical difference
between the elements of a VICAR murder and the special sentencing factors. The VICAR
murders required findings that Defendant had or was seeking a position in the enterprise, and that
Defendant's general purpose in committing the murders charged in [Counts 10-15] . . . was to
maintain or increase his or her position in the enterprise." (May 6 Trial Tr. 105-106); *see also* 18
U.S.C. § 1959. In contrast, the special sentencing factors relating to the Coleman murders did
not require a finding that Defendant committed the murders with the purpose of maintaining or
increasing his position in the enterprise. The fact that the jury found this factor proven, while at
the same time acquitting Defendant of the VICAR murder counts is of no consequence. It does
not show that the jury believed Defendant was not associated with the KSO.

[10] The Indictment charged that Defendant "conspired and agreed" with his co-Defendants
and others, to violate 18 U.S.C. § 1962(c), in that he "knowingly and unlawfully conduct[ed] and
participate[d], directly and indirectly, in the conduct of the affairs of such enterprise through a
pattern of racketeering activity." (Indictment 2.) The RICO conspiracy statute states that "[i]t
shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c)
of this section." 18 U.S.C. § 1962(d). Subsection (c) states that "[i]t shall be unlawful for any
person employed by or associated with any enterprise . . . to conduct or participate, directly or
indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . .
." 18 U.S.C. § 1962(c). We instructed the jury using the exact language contained in the statute
and in the Indictment. (May 6 Trial Tr. 50-54.) In fact, the jury heard, verbatim, both the RICO
conspiracy allegations contained in the Indictment and the language contained in both 18 U.S.C.
§ 1962(c) and (d). (*Id.* at 51.)

346 F.3d 476, 489 (4th Cir. 2003) (finding no constructive amendment when the jury instruction tracked both the language of the statute under which the defendant was charged and the language in the indictment).  Defendant was not deprived of his Fifth Amendment right to be tried only on the charges presented in the Indictment.

The Indictment in this case was clear:  it charged Defendant with RICO conspiracy, in violation of 18 U.S.C. § 1962(d).  The theory surrounding this racketeering conspiracy was laid out for the jury in painstaking detail.  The Government never retreated from its theory. Defendant wholly ignores established RICO conspiracy law in creatively arguing that a constructive amendment has occurred here.

The cases cited by Defendant in support of his constructive amendment argument are easily distinguished from the instant case.  In *United States v. McKee*, 506 F.3d 225 (3d Cir. 2007), the indictment charged the defendant with attempted tax evasion by "preparing, signing, and causing the filing of false and fraudulent federal employment tax returns." *Id*. at 230.  The district court's instruction included a statement that tax evasion could also be found with proof of "falsifying books and records . . . or failing to report to your accountant all of the wages paid to employees." *Id*. at 229-30.  After the jury found the defendant guilty, the Third Circuit overturned the conviction, holding that the instruction "had the effect of broadening the indictment to include conduct not charged in the indictment . . . ." *Id*. at 230.  In *United States v. Syme*, 276 F.3d 131, 149-156 (3d Cir. 2002), the court vacated a false claims act conviction where the district court instructed the jury on a fraud theory that was not alleged in that count of the indictment.  Unlike *McKee* and *Syme*, Defendant was not convicted of a crime different than the one he was charged with, nor was his conviction based on a theory under the RICO statute that was different than the theory alleged in the Indictment.  Defendant was charged with, and

convicted of, RICO conspiracy. The Court instructed the jury on the proper standard to prove this crime. Defendant was not convicted of a different crime than the crime with which he was charged.

Finally, Defendant's argument regarding improper notice—that he was unaware until after the evidence and testimony was complete that the Government would not be required to prove the existence of an enterprise or Defendant's association with that enterprise—is disingenuous, at best. Defense counsel cannot reasonably claim that they did not research the elements of RICO conspiracy prior to the time that jury instructions would be discussed. Indeed, the Third Circuit instructions themselves, which contain a succinct summary of the elements and the supporting law for each crime, state explicitly that neither proof of the existence of the enterprise nor proof of the defendant's association with that enterprise is required. A central purpose of the rule against constructive amendments is to assure that defendants are given adequate notice of charges so that they can prepare a defense. *See United States v. Penaloza*, 648 F.3d 539, 546 (7th Cir. 2011); *United States v. Prince*, 214 F.3d 740, 757 (6th Cir. 2000). Courts will permit "significant flexibility in proof" so long as the defendant "was given notice of the core of criminality to be proven at trial." *United States v. Berger*, 224 F.3d 107, 117 (2d Cir. 2000) (quotation omitted). Here, Defendant was provided with fair notice of the "core of criminality" that was proven at trial. Defendant's argument to the contrary is rejected.

**B. Inconsistent Verdicts**

Defendant also seeks to vacate the RICO conspiracy conviction on the premise that the jury's verdict on this count is inconsistent with the jury's acquittal on Count 9, which charged conspiracy to commit murder in aid of racketeering ("VICAR conspiracy"). Defendant argues that, because the jury found that the special sentencing factors related to the Coleman family

murders were proven (Special Sentencing Factors #9-14) as to the RICO conspiracy count, but found that no other special sentencing factor was proven, the elements of the RICO conspiracy count are therefore limited by these special sentencing factors. Defendant argues that, since the elements of RICO conspiracy, as limited by Special Sentencing Factors 9-14, are identical to the elements of VICAR conspiracy, a verdict of guilty on one count is inherently inconsistent with an acquittal on the other count, and warrants judgment of acquittal of the RICO conspiracy count.

The Supreme Court has determined that "inconsistent verdicts are constitutionally tolerable." *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *United States v. Powell*, 469 U.S. 57, 65 (1984); *see also Dunn v. United States*, 284 U.S. 390, 393 (1932) (stating that "[e]ach count in an indictment is regarded as if it was a separate indictment" so "[c]onsistency in the verdict is not necessary."). "'Consistency of verdicts is not necessary in a criminal trial.'" *United States v. Maury*, 695 F.3d 227, 264 (3d Cir. 2012) (quoting *United States v. Vastine*, 363 F.2d 853, 854 (3d Cir. 1966)). When a defendant is acquitted on one count and convicted on another count, "in most circumstances 'the most that can be said . . . is that the verdict shows that . . . the jury did not speak their real conclusions' on one of the convictions." *Id.* (quoting *Dunn*, 284 U.S. at 393). "As a matter of law, courts treat this situation as an instance of juror lenity, undeserving as a basis for overturning a conviction." *Id.* (citation omitted); *see also United States v. Gross*, 961 F.2d 1097, 1107 (3d Cir. 1992) (sustaining conviction and stating that "[a]s *Powell* makes clear, inconsistency between acquittals and convictions may result from jury lenity and does not merit reversal of the convictions").

In arguing that the RICO conspiracy conviction is inconsistent with the VICAR conspiracy acquittal, Defendant relies entirely on the case of *United States v. Infelise*, 813 F.

Supp. 599 (N.D. Ill. 1993). In *Infelise*, after the defendant was found guilty of conspiracy to commit murder in aid of racketeering but found not guilty of the same conspiracy charged as an underlying racketeering act, he sought a mistrial on the grounds that the verdicts were inconsistent. 813 F. Supp. at 606-07. While recognizing the general rule that inconsistent verdicts are constitutionally permissible, the court went on to state that the facts of the case do not "fit squarely" within the rationale of the general rule. *Id*. at 608. The court recognized that in certain rare cases, a mistrial may be appropriate "where the verdicts are based on charges with virtually identical elements." *Id*. The court ultimately granted the defendant's request for a mistrial. *Id*. at 613.[11]

The parties dispute the effect that *Infelise*—a Northern District of Illinois case—should have on this Court. We agree with the Government that we are not bound by the holding of *Infelise*. Moreover, neither party has provided the Court with any authority from this Circuit that carves out exceptions to the general proposition that inconsistent verdicts are permissible. However, even if we were to recognize the exception set forth in *Infelise*—that a jury's acquittal on one count that has "virtually identical elements" to another count for which a guilty verdict was returned warrants a mistrial of the conviction—Defendant's argument is nevertheless meritless because the two counts at issue here do not contain virtually identical elements.

---

[11] We note that, in *Infelise*, the decision to grant a mistrial was based principally on the fact that, weeks after the verdict was returned, it was determined that the verdict on the conspiracy to commit murder in aid of racketeering count did not reflect a unanimous consensus of the jury. Just days after the trial, three of the jurors appeared on a local news station stating that a mistake had been made on this count. 813 F. Supp. at 603. As a result, the court decided to poll the jury, and determined that nine of the twelve jurors indicated that some error was made in rendering their verdict on the conspiracy count. *Id*. at 612. Three of those jurors indicated that they voted not guilty on this count, and the jury's verdict was not unanimous. *Id*. In granting the mistrial, the court expressed the limitations of its holding, stating that "the ruling is confined to the specific facts" of this "highly unusual" and "complex" case, and that the court "strongly believes that such an extreme measure as vacating a verdict should not be considered under anything but unusual circumstances." *Id*. at 613.

The elements of a RICO conspiracy are:

(1) Two or more persons agreed to conduct or to participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity;

(2) The defendant was a party to or member of that agreement;

(3) The defendant joined the agreement or conspiracy knowing of its objective to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve the objective of conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity.

*United States v. Savage*, No. 07-550, 2012 U.S. Dist. LEXIS 76491, at *41-42 (E.D. Pa. June 1, 2012) (citing Third Circuit Model Jury Instructions § 6.18.1962D, 18 U.S.C. § 1962(d) and *United States v. Riccobene,* 709 F.2d 214, 220-21 (3d Cir. 1983)); (*see also* May 6, 2013 Trial Tr. 52-53 (outlining elements of RICO conspiracy).).

The elements of VICAR conspiracy are:

(1) two or more persons agreed to commit a violent crime in aid of racketeering;

(2) that the defendant was a party to or member of that agreement; and

(3) that the defendant joined the agreement or conspiracy knowing of its objective to commit a violent crime in aid of racketeering and intending to join in together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve that objective.

(May 6 Trial Tr. 115-116.) Finally, the elements of a violent crime in aid of racketeering under 18 U.S.C. § 1959(a), which includes conspiracy to commit murder in aid of racketeering, are:

(1) the existence of an enterprise affecting interstate commerce;

(2) that the enterprise engaged in racketeering activity;

(3) that defendant had, or was seeking, a position in the enterprise;

(4) that defendant committed the alleged crime of violence; and

(5) that defendant's general purpose in committing the crime of violence was to maintain or increase his position in the enterprise or was in consideration for the receipt of anything of value.

(*Id*. at 105-106); *see also United States v. Jones*, 566 F.3d 353, 363 (3d Cir. 2009) (citing 18 U.S.C. § 1959(a)); *United States v. Savage*, 2012 U.S. Dist. LEXIS 76491, at *42-43.

In our June 1, 2012 Memorandum denying Defendants' double jeopardy claims, we compared the elements of RICO conspiracy with the elements of VICAR conspiracy and determined that the two crimes were different for purposes of double jeopardy:

Count 9, the VICAR conspiracy, contains elements that the RICO conspiracy does not. Specifically, for a §1959(a) conspiracy, the Government must prove that the defendant "(1) agreed with others to commit a violent crime . . . and (2) entered into that agreement 'for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity.'" *United States v. Basciano*, 599 F.3d 184,198-99 (2d Cir. 2010) (quoting 18 U.S.C. § 1959(a)(5)). These two elements are not needed to prove a RICO conspiracy under 18 U.S.C. § 1962(d). *Id*. Rather, the RICO conspiracy requires proof that the defendant agreed with others to conduct the affairs of the enterprise through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(d); *see also Riccobene*, 709 F.2d at 220-21. "While the pattern element demands proof of an agreement to commit at least two crimes, neither crime need involve the violence specified in § 1959(a)(5)." *Basciano*, 599 F.3d at 199 (citing 18 U.S.C. § 1961(1) (identifying wide range of crimes that can constitute racketeering activity)).

Accordingly, under *Blockburger*, since the conspiracy to commit murder in aid of racketeering offense is distinct from the RICO conspiracy offense, there are no double jeopardy implications.

*United States v. Savage*, 2012 U.S. Dist. LEXIS 76491, at *43-44.

The RICO conspiracy count and the VICAR conspiracy count do not contain the same elements. Defendant's argument that the two crimes are "virtually identical" is rejected. Significantly, the jury, in considering the VICAR murder, had to determine whether Defendant joined the agreement or conspiracy "to maintain or increase his position in the enterprise," a

determination that the jury did not have to make when deliberating on the RICO conspiracy count.

Defendant's attempt to conflate the RICO conspiracy count and the proven special sentencing factors in arguing that the two conspiracies have virtually identical elements is similarly unavailing. First, Defendant provides no support for this novel idea that a crime may be examined, post-conviction, as narrowed by other findings by the jury. Even accepting Defendant's assumption that this is permissible, the jury's findings on the special sentencing factors are unrelated to its findings with respect to RICO conspiracy. Simply because the jury determined that the drug-related special sentencing factor was not proven does not mean that Defendant could not have been found guilty of RICO conspiracy. As the Supreme Court made clear, RICO conspiracy does not require a finding that Defendant himself committed or agreed to commit two racketeering acts:

> It makes no difference that the substantive offense under subsection (c) requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense.

*Salinas*, 522 U.S. at 65. In addition, the fact that the jury found the drug-related special sentencing factor not proven does not mean that the jury did not find that Defendant's drug arrests on Jerome Street themselves qualify as racketeering acts in furtherance of the RICO conspiracy. As discussed hereinafter, *see infra* at Section III.C, to find the drug-related special sentencing factor proven, the jury was required to find that a certain threshold amount of drugs was attributed to Defendant. There is no similar threshold amount requirement to find that Defendant's narcotics convictions qualified as racketeering acts. In any event, even if we were to view the RICO conspiracy conviction as a mere conspiracy to commit the Coleman family

murders, as Defendant suggests, the two conspiracies still do not contain "virtually identical elements." Specifically, even when limited by the proven special sentencing factors, the RICO conspiracy did not require the jury to determine whether an enterprise existed, and whether Defendant's purpose in committing the murders was to maintain or increase his position in the enterprise. The VICAR conspiracy did. Defendant ignores this difference between the two conspiracy crimes. Defendant's request to vacate the RICO conspiracy count based upon inconsistent verdicts will be denied.

### C.    Sufficiency of the Evidence on Count 1 – RICO Conspiracy

Defendant argues that the RICO conspiracy conviction should be vacated on the basis that there was insufficient evidence to support the verdict. Specifically, Defendant contends that the Government failed to prove that Defendant agreed "that a conspirator would commit at least two acts of racketeering in the conduct of the enterprise's affairs." (Def.'s Mot. 20.) Defendant's argument is premised on the assumption that his participation in the firebombing was the only overt act that the jury found that he had committed, and therefore, the two racketeering act requirement was not met. Defendant bases his argument on the fact that the jury determined that the special sentencing factors related to the Coleman family murders were proven, while the special sentencing factors related to drug distribution and witness retaliation were not proven.

Because Defendant makes a sufficiency of the evidence argument, "[w]e must view the evidence in the light most favorable to the jury verdict and presume that the jury properly evaluated credibility of witnesses, found the facts, and drew rational inferences." *United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir. 1992). The jury's verdict should be sustained "if there is

substantial evidence, taking the view most favorable to the Government, to support it." *Id.*

(quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)).

The Court instructed the jury on the elements necessary to convict Defendant of RICO

conspiracy. These elements are listed above. *See Supra* Section III.B. One of the elements is an

agreement "to conduct or to participate directly or indirectly in the conduct of an enterprise's

affairs through a pattern of racketeering activity." (Jury Charge, May 6 Trial Tr. 52.) The Court

also provided guidance with regard to this agreement to commit a RICO offense, stating:

> You may find a defendant has entered into the requisite agreement to violate the
> RICO statute if the Government has proven beyond a reasonable doubt that the
> defendant agreed with at least one other co-conspirator that at least two
> racketeering acts of the type or types of racketeering activity listed in the
> indictment would be committed by a member of the conspiracy in the conduct of
> the affairs of the enterprise. The Government is not required to prove that the
> defendant personally committed two racketeering acts, or that he agreed to
> personally commit two racketeering acts. Rather, it is sufficient if the
> Government proves beyond a reasonable doubt that the defendant agreed to
> participate in the enterprise with the knowledge and intent that at least one
> member of the RICO conspiracy, who could be, but need not be, the defendant
> himself, would commit at least two racketeering acts in the conduct of the affairs
> of the enterprise.

(*Id.* at 66-67.)

Thus, for the jury to have found that Defendant joined the agreement to commit a RICO

offense, it must have determined that the Defendant agreed with at least one other co-conspirator

that at least two racketeering acts would be committed by a member of the conspiracy. The

evidence and testimony presented during the trial revealed Defendant's involvement in multiple

racketeering acts. In addition to his participation in the Coleman murders, the jury heard that

Defendant sold drugs on 8th and Venango Streets, for and under the protection of Lamont Lewis,

a former KSO associate. The jury also heard that Defendant sold drugs on Jerome Street, during

a time when the block was controlled by KSO associate Mansur Abdullah, and was arrested three

times for those drug sales.  The jury also heard evidence about Defendant's possession of a

firearm in the vicinity of 8th and Venango Streets, and about Defendant's involvement in arson,

witness intimidation, and witness retaliation.  Viewing the evidence in a light most favorable to

the Government, we are satisfied that substantial evidence supported the jury's verdict.   We

presume that the jury followed our instructions on the elements of RICO conspiracy.  *See United

States v. Bryant*, 655 F.3d 232, 252 (3d Cir. 2011) ("[W]e generally presume that juries follow

their instructions.").  The jury found Defendant guilty of RICO conspiracy.  Therefore, we

presume that the jury determined that Defendant agreed with at least one other co-conspirator

that at least two racketeering acts would be committed.[12]

Defendant's argument—that the jury only found one racketeering act proven, which is

insufficient to sustain his conviction—reveals confusion about the function of special sentencing

factors, the difference between these factors and racketeering acts, and the Government's burden

of proof with respect to the RICO conspiracy count.

The purpose of the special sentencing factors was to determine what the appropriate

sentence would be if Defendant was convicted of RICO conspiracy.  RICO's penalty provision,

18 U.S.C. § 1963(a), provides that a defendant convicted of a RICO offense "shall be . . .

imprisoned not more than 20 years (or for life if the violation is based on racketeering activity

for which the maximum penalty includes life imprisonment) . . . ."  18 U.S.C. § 1963(a).  In

accordance with this provision, any racketeering acts that independently carry a possible

sentence of life imprisonment were submitted to the jury to determine if they were proven

---

[12] The parties disagree about whether or not each of the six murders that resulted from the firebombing of the Coleman residence qualify as separate racketeering acts for purposes of establishing a pattern of racketeering activity.  We need not decide this issue, however, because even if we were to view the firebombing and resulting murder charges as one racketeering act, we nevertheless find that there was sufficient evidence of other racketeering acts for a jury to find Defendant guilty of RICO conspiracy.

beyond a reasonable doubt. *See Apprendi*, 530 U.S. at 490 (stating that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt").

In contrast, a predicate racketeering act, as defined in 18 U.S.C. § 1961(1), includes "any act or threat involving" a variety of crimes, including murder, arson, and dealing in controlled substances, "which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(a). To qualify as a racketeering act, the crime need only be punishable by imprisonment for more than one year. The difference between the possible sentences of racketeering acts and special sentencing factors undercuts Defendant's argument. This difference is illustrated by the jury's determination with respect to Defendant's drug distribution. The special sentencing factor put before the jury contained specific threshold amounts. Specifically, to find the factor proven with respect to Defendant, the jury had to determine that he "knowingly and intentionally conspired and agreed to distribute, and to possess with intent to distribute 5 kilograms or more . . . of cocaine, 280 grams or more of . . . cocaine base ("crack"), heroin, marijuana, and one kilogram or more of . . . phencyclidine (PCP)." (Verdict.) The Jury found this factor was not proven. However, this finding does not foreclose the possibility that the jury found Defendant's drug sales on Jerome Street and at 8th and Venango, which involved lesser quantities than those required of the special sentencing factor, nevertheless qualified as a racketeering act to support a conviction.

Defendant's argument is also flawed because it is based upon an erroneous assumption about RICO conspiracy law. Simply because the jury found some special sentencing factors proven and others not proven does not have any bearing on whether or not the facts supported a RICO conspiracy conviction. The jury was instructed that "the Government [was] not required

34

to prove that the defendant personally committed two racketeering acts, or that he agreed to personally commit two racketeering acts." (May 6 Trial Tr. 66-67); *see also Salinas*, 522 U.S. at 63. Rather, the Government was only required to prove that Defendant agreed that two or more racketeering acts would be committed by a co-conspirator in the conduct of the affairs of the enterprise. (May 6 Trial Tr. 66-67); *see also United States v. Ligambi*, No. 09-496, 2012 U.S. Dist. LEXIS 86847, at *12 (E.D. Pa. June 21, 2012) ("Rather, all the government is required to prove is that if the objective of the conspiracy was achieved, the enterprise would be established, and that the defendant agreed that two or more acts of racketeering would be committed by a conspirator in the conduct of the affairs of the enterprise." (citing *Salinas*, 522 U.S. at 66)). We reject Defendant's argument that the evidence was insufficient to support the RICO conspiracy conviction.

## IV.     MOTION FOR NEW TRIAL

Finally, in Defendant's Supplemental Motion, he claims that he is entitled to a new trial based upon newly discovered evidence. Defendant also claims that the Government withheld exculpatory and impeachment evidence in violation of *Brady* and *Giglio*.

### A.     Factual Premise

On April 5, 2000, Defendant was arrested and charged with possession with intent to distribute cocaine base. After pleading not guilty, a bench trial before Judge Lisa A. Richette resulted in a conviction. Former PPD officer Jeffrey Cujdik testified at that trial, along with at least three other PPD officers. According to Defendant, Cujdik's testimony was inconsistent with the trial testimony of other police officers, which prompted defense counsel to challenge

Cujdik's credibility.[13]  Defendant claims that "Cujdik's credibility was crucial to the prosecution's case."  (Def.'s Supp. Mot. 4.)

Defendant was also arrested on two other occasions in 2000 for possession of crack cocaine.  He was arrested on June 11 and July 25, 2000 on West Jerome Street.  (Mar. 11 Trial Tr. 156.)  Defendant entered guilty pleas to these two charges.  (Gov't's Ex. 220.)  Defendant was sentenced by Judge Richette on all three convictions.  (*Id*.)  These three convictions were offered into evidence during this criminal trial.  (*See* Gov't's Ex. 216-01, 216-02, 216-03.)  The Government used these convictions to support the RICO conspiracy charge against Defendant.

In February 2009, the Daily News reported that Cujdik had engaged in a pattern of fabricating evidence to obtain warrants and make arrests.  The allegations came from a confidential informant that worked closely with Cujdik.  As a result of the allegations, the Federal Bureau of Investigations ("FBI") and PPD's Internal Affairs Division ("IAD") launched an investigation into Cujdik.  Aware of this investigation, counsel for Defendant made multiple requests to the Government for *Brady* and *Giglio* material related to Cujdik.[14]  A May 13, 2014 article in the Philadelphia Inquirer entitled "In Narcotics Probe, One Officer Fired, Others Suspended," reported that the investigation had concluded, that federal and local authorities had declined to pursue criminal charges against the officers, but that Cujdik would likely be terminated from the PPD.[15]  The article also reported that the probe spent years investigating

---

[13] In his Motion for a New Trial, Defendant lays out the specific facts surrounding Defendant's arrest on April 5, 2000.  We need not address the facts supporting Defendant's conviction in 2000 as they are not relevant for purposes of the instant Motion.

[14] The Government does not dispute that defense counsel made multiple requests for information related to the IAD and FBI investigation of Cujdik.

[15] Mike Newell & Aubrey Whelan, *In Narcotics Probe, One Officer Fired, Others Suspended*, Phila. Inquirer, May 14, 2014, http://articles.philly.com/2014-05-14/news/49823781_1_thomas-tolstoy-jeffrey-cujdik-ramsey

allegations of false warrants and thefts from bodegas, and concluded with eight findings of misconduct against the four police officers.  Cujdik specifically was alleged to have intentionally fabricated evidence on a warrant, given gifts to confidential informants, and lied when asked about the improper gifts.  The IAD report is not publicly available.

### B.    Legal Standard

#### 1.    Rule 33

Federal Rule of Criminal Procedure 33 provides that:  "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. . . ." Fed. R. Crim. P. 33.  The Third Circuit has set forth five requirements that must be met before a court may grant a new trial on the basis of newly discovered evidence:

> (a) [T]he evidence must be in fact newly discovered, i.e., discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*Gov't of Virgin Islands v. Lima*, 774 F.2d 1245, 1250 (3d Cir. 2000) (citing *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976)).  The decision to grant or deny a motion for a new trial lies solely within the discretion of the district court.  *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006).  However, "the movant has a 'heavy burden' of proving each of these [Rule 33] requirements."  *Id.*  As such, "[c]ourts should 'exercise great caution in setting aside a verdict reached after fully-conducted proceedings,' and particularly so where 'the action has been tried before a jury.'"  *United States v. Kelly*, 539 F.3d 172, 182 (3d Cir. 2008) (quoting *United States v. Kamel*, 965 F.2d 484, 493 (7th Cir. 1992)).  If the defendant cannot prove each requirement, the court should deny the motion for a new trial.  *See United States v. Jasin*, 280

F.3d 355, 365 (3d Cir. 2002).

### 2. *Brady and Giglio Violation*

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the prosecution's suppression of evidence favorable to a criminal defendant violates due process when the evidence is material to guilt or punishment." *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006). To establish a *Brady* violation, the defendant must demonstrate that: "(1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment." *Id*. This is an objective test, meaning that the defendant may establish a Brady violation "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see Risha*, 445 F.3d at 303.

Under *Giglio v. United States*, 405 U.S. 150 (1972), the Government's disclosure obligations were expanded to include "materials that might affect the jury's judgment of the credibility of a crucial prosecution witness." *United States v. Friedman*, 658 F.3d 342, 357 (3d Cir. 2011) (quoting *United States v. Milan*, 304 F.3d 273, 287 (3d Cir. 2002)). Thus, under *Giglio*, failure by the Government to provide impeachment evidence related to a crucial prosecution witness falls under *Brady*, and may form the basis for a new trial. *See United States v. Pelullo*, 105 F.3d 117, 120 (3d Cir. 1997); *United States v. Johnson*, 380 F. Supp. 2d 660, 672 n.4 (E.D. Pa. 2005).

### C. Analysis

### 1. *Newly Discovered Evidence*

Defendant seeks a new trial on the basis that the May 13, 2014 newspaper article, which reported on the IAD's conclusion that four PPD officers, including Cujdik, had engaged in misconduct, constitutes newly discovered evidence warranting a new trial. Specifically,

Defendant contends that the evidence that Cujdik had been found to have fabricated evidence on a warrant and lied about gifts made to confidential informants taints his 2000 conviction for which Cujdik was a testifying witness and which served as an overt act in the RICO conspiracy for which he was found guilty in this action.

Initially, we note that Defendant overstates the information reported by the Philadelphia Inquirer article. The conduct attributed to Cujdik, at least according to the reporters, was that he, on one occasion, intentionally fabricated evidence on a warrant, gave gifts to confidential informants, and later lied about the gifts. Contrary to Defendant's characterization of it, the article does not report that the IAD investigation uncovered evidence of "*systematic* falsification in PWID cases" on the part of Cujdik. (Def.'s Supp. Mot. 8 (emphasis added).) However, even if Cujdik was guilty of the conduct described by Defendant, a new trial is nevertheless not warranted.

To be granted a new trial, Defendant must show that: (1) the new evidence was discovered since the time of his trial; (2) he or his counsel exercised diligence in obtaining evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues involved; and (5) the newly discovered evidence is of such a nature that it would "probably produce an acquittal." *United States v. Quiles*, 618 F.3d 383, 388-89 (3d Cir. 2010). Unless each of these elements is satisfied, his Motion fails. *Kelly*, 539 F.3d at 182.

The first two elements are not at issue here. Defendant first learned that the IAD investigation concluded and sustained findings of misconduct against Cujdik in May 2014, almost a year after Defendant was convicted.[16] In addition, there is no question that counsel for

---

[16] The Government contends that the IAD investigation of Cujdik does not constitute newly-discovered evidence, and thus, Defendant's Motion is untimely. (Gov't's New Trial Resp. 4-5.) Specifically, the Government claims that defense counsel knew about the investigation before the trial began, and that the only "new development" was that the

Defendant was diligent in seeking information related to the IAD investigation. They repeatedly requested information from the Government about the investigation. The third element also does not appear to be at issue. The evidence is not cumulative because the investigation behind Cujdik was not an issue raised at this trial. In addition, the evidence could not be offered merely to impeach Cujdik since he did not testify at this trial. Rather, the state court convictions themselves were offered into evidence as proof in support of the RICO conspiracy charge. To the extent that Defendant proposes to use the IAD's investigation and findings to impeach Cujdik's credibility and indirectly undermine his state court trial testimony at a new trial in this matter, this would be an improper attempt to collaterally attack his state court conviction. If Defendant wishes to challenge his state court conviction with IAD's findings, he must use the proper vehicle. A Rule 33 request in this case is not the proper way to do it.[17]

With regard to the fourth requirement, we are not persuaded that the findings by the IAD with respect to Cujdik's prior misconduct as a police officer is material to the issues involved in this case. Defendant suggests that because Cujdik was found to have previously fabricated evidence on a warrant, and found to have lied about gifts he gave to informants, he must have engaged in similar misconduct in relation to the arrest and prosecution of Defendant in 2000. Such an assumption is tenuous at best. In any event, the Government has made clear that the investigation did not lead to any allegations or evidence of misconduct by Cujdik with regard to

---

investigation concluded. While this is true, the newspaper article also reported for the first time that the investigation sustained findings of misconduct against Cujdik. In any event, whether the findings of misconduct are deemed newly discovered or not, Defendant has failed to show that a new trial is warranted in this case.

[17] Defendant has, in fact, just filed a post-conviction petition in state court seeking to vacate his PWID conviction. He has also just sought permission from the Third Circuit to file a second habeas petition with regard to his federal firearms conviction.

the three drug arrests of Defendant in 2000.  In its May 29, 2014 letter, counsel for the

Government stated that:

> Defense counsel specifically requested that government counsel ascertain whether
> the investigation of Mr. Cujdik contained any allegations or evidence as to the
> three 2000 drug cases for which Merritt had been convicted.  Government counsel
> indeed made those inquiries, the result of which was that there were no allegations
> or evidence of misconduct as to the three Merritt drug cases.  In an abundance of
> caution, government counsel renewed that inquiry today, and was assured by the
> Assistant U.S. Attorney who supervised the Cujdik investigation that no such
> evidence exists.  Thus, there was, and is, no *Brady* material to disclose.

(Gov't's May 29, 2014 Ltr. (on file with Court).)  Based on this, we conclude that there is no

aspect of the IAD's investigation into Cujdik that relates to the evidence presented in the case

against Defendant, let alone evidence that is *material* to issues surrounding the RICO conspiracy

conviction.

Finally, we are not persuaded that evidence of Cujdik's prior misconduct would result in

an acquittal of the RICO conspiracy conviction.  Significantly, the jury heard evidence that

Defendant admitted to the drug possession in question.  Specifically, Defendant wrote a letter to

Judge Yohn in preparation for his sentencing on the federal firearms possession conviction.  The

letter reads, in part:

> Your Honor,
>
> I am 25 years old.  In 1999 I was arrested at 19 years of age, as a minor
> participant in a typical North Philadelphia neighborhood corner drug scene.  I was
> arrested with small quanititye (sic) of cocaine base three time (sic) within slightly
> more then (sic) three months.  All three arrests were for the same minor conduct
> in the same neighborhood.  I was sentenced to 6 years probation.
>             . . .
> I was arrested for the instant [firearm possession] offense.  I do not believe that I
> am an armed career criminal and in defense of my innocence I made the mistake
> of going to trial believing my own innocence.  I apologize for taking this courts
> time and costing the government money in this way and realize that I can only
> depend on the mercy of this court in its judgment of me.

(Gov't's Ex. 218.)  Evidence that Defendant admitted to being arrested three times in possession of small quantities of cocaine base undermines his claim that Cujdik's prior misconduct would help prove that Defendant did not in fact commit the drug crime in question.[18]

In any event, there was a substantial amount of evidence supporting Defendant's guilty verdict for RICO conspiracy.  Even if Defendant were permitted to offer evidence of Cujdik's prior misconduct, and even if that evidence would convince a jury that Defendant's April 5, 2000 narcotics arrest should not be considered in deliberating on the RICO conspiracy charge, there were two other narcotics convictions for the jury's consideration that have no relation to Cujdik. This evidence of narcotics possession and distribution, together with all of the other evidence, including evidence that Defendant committed six murders in aid of racketeering, and engaged in arson, and witness intimidation, was more than sufficient for the jury to find Defendant guilty of RICO conspiracy.  Defendant's request for a new trial on the basis of newly discovered evidence will be denied.

### 2. *Brady and Giglio Violations*

Finally, Defendant seeks a new trial on the basis of alleged *Brady* and *Giglio* violations by the Government.  Specifically, Defendant argues that the Government should have disclosed evidence that Cujdik was found to have committed prior misconduct in relation to other narcotics arrests.  Defendant's argument fails for the same reason that his newly discovered evidence

---

[18] Indeed, even Defendant's counsel does not dispute that Defendant possessed and sold drugs on these occasions.  During trial, counsel made the following statement during opening arguments:

> You also heard Mr. Troyer talk about Jerome Street.  You will hear evidence, and we embrace the evidence.  We are not denying the evidence, that on three occasions back in the year 2000, April 4th, June 14th, and July 25th of 2000, 13 years ago, Mr. Merritt sold very small amounts of drugs on Jerome Street.

(February 5, 2013 Trial Tr. 16, ECF No. 1126.)

argument fails. Defendant is unable to establish that the evidence is "material to guilt or punishment." *Risha*, 445 F.3d at 303. Evidence is material for purposes of *Brady* violations if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995). As explained above, there is no evidence that Cujdik engaged in any misconduct with regard to his arrest of Defendant in 2000. Nor is there any evidence that Cujdik offered perjured testimony at Defendant's state court trial. There was nothing for the Government to disclose. Moreover, in the face of Defendant's admission to Judge Yohn that he was arrested with quantities of cocaine base in his possession, we are satisfied that the jury would have found him guilty of RICO conspiracy even with evidence of Cujdik's prior misconduct. Defendant has also failed to show a *Giglio* violation. Impeachment evidence is material if it might have altered the jury's judgment of the credibility of a crucial prosecution witness. *United States v. Coletta*, 59 F. App'x 492, 494 (3d Cir. 2003). Cujdik did not testify in Defendant's federal case and was therefore not a crucial prosecution witness. Defendant's request for a new trial on this basis will also be denied.

## V.      CONCLUSION

For the foregoing reasons, Defendant Robert Merritt's Motion for Judgment of Acquittal and Supplemental Motion for a New Trial will be denied.

An appropriate Order will follow.

BY THE COURT:

_____

**R. BARCLAY SURRICK, J.**