**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **ROBERT MERRITT,** | : | **NO. 07-cr-550-4** |
| **Defendant.** | : | |

# MEMORANDUM

**KENNEY, J.** **August 31, 2026**

Before the Court is Defendant Robert Merritt's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255 (ECF No. 1784, the "Petition"). In 2013, following a jury trial, Merritt was convicted of one count of RICO conspiracy, which was based on Merritt's participation in the murders of six Coleman family members who died in a firebombing on October 9, 2004. ECF No. 1330. In 2014, Judge Surrick sentenced Merritt to life imprisonment. ECF No. 1585. After a failed appeal to the Third Circuit, Merritt filed the instant Petition in April 2025. ECF No. 1784. For the reasons stated below, the Petition (ECF No. 1784) will be denied.

## I. BACKGROUND

The facts are drawn from the Third Circuit's summary of the case in its opinion affirming the jury's guilty verdicts and sentences for Merritt and two of his co-defendants on direct appeal. *See United States v. Savage*, 85 F.4th 102 (3d Cir. 2023) (hereinafter "*Savage II*"). Merritt, along with co-defendants Kidada Savage and Steven Northington, was indicted and convicted for his role in the violent activities of the Kaboni Savage Organization ("KSO"), a regional drug trafficking gang operating in North Philadelphia that was led by ringleader Kaboni Savage. *Id.* at 112. From 1997 to 2010, the KSO sold powder cocaine, "crack" cocaine, and liquid phencyclidine ("PCP"). *Id.* Merritt's older cousin, Lamont Lewis, was a high-ranking KSO member who sold

drugs for the KSO and murdered multiple people at the behest of Kaboni Savage. *Id.* at 113 & n.2; *see also United States v. Savage*, 970 F.3d 217, 232–35 (3d Cir. 2020) (hereinafter "*Savage I*"). Although he was "not a full-fledged KSO member" himself, Merritt did sell drugs for the KSO, often with Lewis, and he assisted Lewis in carrying out the firebombing of the Coleman family home, resulting in the deaths of six individuals. *Savage II*, 85 F.4th at 112.

The firebombing occurred in October 2004, in retaliation for former KSO member Eugene Coleman's cooperation with the government. *Id.* At the time, Kaboni Savage was in jail awaiting trial for federal drug trafficking charges and had gotten wind that Coleman was assisting the prosecution. *Savage I*, 970 F.3d at 234. Through his sister Kidada Savage, Kaboni ordered Lewis to "firebomb the Colemans' house." *Savage II*, 85 F.4th at 112 (record citation omitted). Lewis, in turn, recruited Merritt to help him execute the firebombing. *Id.* at 113. In the early morning hours of October 9, 2004, Lewis and Merritt "went to a local gas station, bought two gas cans, filled them with gasoline, and put them in the trunk of [Lewis'] car." *Id.* The pair then drove to Merritt's house in West Philadelphia to pick up a gun, "but at approximately 4:08 a.m., a Philadelphia highway patrol officer pulled them over for speeding." *Id.* The officer ended up letting them drive away because he was called to another scene. *Id.*

After retrieving the gun, Lewis and Merritt made their way to the Coleman family home and parked around the corner from the house. *Id.* "They removed the cans from the trunk, stuffed a cloth into one of the cans to serve as a wick, and carried the two cans to the house." *Id.* At the front porch of the house, Lewis handed Merritt a lighter, kicked in the front door, then walked into the house and fired two shots. *Id.* When he kicked in the door, Lewis heard a woman from inside say, "Who's that?" *Id.* (record citation omitted). "Merritt immediately ran into the house and threw a lit gas can into the living room, causing a 'big explosion.'" *Id.* (record citation omitted).

Following the explosion, Merritt exited the house and then threw the unlit can into the house. *Id.* Afterwards, Lewis called Kidada and left her a message to let her know that the firebombing was completed. *Id.* For his role in the firebombing, Merritt received a used car and $500. *Savage I*, 970 F.3d at 235.

The firebombing killed all six individuals who were sleeping in the house that night: Coleman's mother, Marcella Coleman; his fifteen-month-old son, Damir Jenkins; his twin-brother's fifteen-year-old son, Sean Rodriguez; his sister Regina Nash's twelve-year-old son, Tajh Porchea; his cousin, Tameka Nash; and Tameka's ten-year-old daughter, Khadijah Nash. *Id.*

On May 9, 2012, a grand jury in the Eastern District of Pennsylvania returned the Fourth Superseding Indictment in this case, which charged Merritt with one count of RICO conspiracy, one count of conspiracy to commit murder in aid of racketeering, six counts of murder in aid of racketeering, one count of retaliation against a witness, and one count of using fire in the commission of a felony. *Savage II*, 85 F.4th at 113. Following a jury trial, Merritt was found guilty on the RICO conspiracy count and not guilty as to all other counts. *Id.* at 114. On September 19, 2024, the District Court sentenced Merritt to life imprisonment on the RICO conspiracy count because the conviction was based on RICO predicate acts—the six Coleman family murders—for which the maximum penalty is life imprisonment. *Id.* at 114, 137. Merritt timely appealed his conviction and sentence to the Third Circuit, which affirmed the judgment of the District Court following an extensive examination of the record. *Id.* at 114, 139. Merritt's petition for a writ of certiorari was denied by the United States Supreme Court. *Merritt v. United States*, 144 S. Ct. 1468 (Mem) (2024).

On April 28, 2025, Merritt filed the instant Petition. ECF No. 1784. On November 6, 2025, the above-captioned case was reassigned from Judge Surrick to this Court. ECF No. 1787. After

being ordered to do so, the Government filed its response to the Petition on December 19, 2025. ECF Nos. 1789, 1794. Merritt filed a reply on February 10, 2026. ECF No. 1804. Accordingly, the Petition is ripe for adjudication.

## II. LEGAL STANDARD

An inmate in federal custody may challenge the validity of his sentence under 28 U.S.C. § 2255 by filing a petition for a writ of habeas corpus. *See Okereke v. United States*, 307 F.3d 117, 120 (3d Cir. 2002). Pursuant to 28 U.S.C. § 2255, a court may "vacate, set aside or correct" a sentence that "(1) was imposed in violation of the Constitution or laws of the United States; (2) was imposed by a court lacking jurisdiction; (3) was in excess of the maximum authorized by law; or (4) is otherwise subject to collateral attack." *United States v. Small*, 747 F. Supp. 3d 817, 821 (E.D. Pa. 2024) (citing 28 U.S.C. § 2255(a)). "A section 2255 petition is not a substitute for an appeal, nor may it be used to relitigate matters decided adversely on appeal." *Gov't of V.I. v. Nicholas*, 759 F.2d 1073, 1074–75 (3d Cir. 1985) (citations omitted).

The court accepts the truth of the petitioner's allegations when reviewing a § 2255 motion unless those allegations are "clearly frivolous on the basis of the existing record." *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005). A court is required to hold an evidentiary hearing when the motion "allege[s] any facts warranting relief under § 2255 that are not clearly resolved by the record." *See United States v. Tolliver*, 800 F.3d 138, 141 (3d Cir. 2015) (quoting *Booth*, 432 F.3d at 546) (alteration in original). However, bald assertions and conclusory allegations do not provide sufficient grounds to require an evidentiary hearing. *United States v. Donahue*, 792 F. App'x 165, 168 (3d Cir. 2019).

Claims for ineffective assistance of counsel are governed by the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. *See Wiggins v. Smith*, 539

U.S. 510, 521 (2003) (acknowledging that *Strickland* governs claims for ineffective assistance of counsel). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" such that petitioner was effectively denied "counsel" as guaranteed by the Sixth Amendment, with reasonableness being judged by the professional norms prevailing at the time that counsel rendered assistance. *Strickland*, 466 U.S. at 688, 690. In evaluating the reasonableness of counsel's performance, courts "must be highly deferential" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Under the second *Strickland* prong, a petitioner must demonstrate that counsel's errors were prejudicial—that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Id.* at 694. Further, "[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (quoting *Strickland*, 466 U.S. at 696). In ruling on a § 2255 petition, the court may address the prejudice prong first "and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced." *Rolan v. Vaughn*, 445 F.3d 671, 678 (3d Cir. 2006).

## III. DISCUSSION

Merritt's Petition raises three claims for ineffective assistance of counsel for (1) failing to sufficiently investigate and obtain for trial testimony which could have raised reasonable doubt on the Government's central assertion at trial that Merritt agreed to assist and did assist Lamont Lewis with the firebombing; (2) failing to sufficiently investigate and counter the Government's cell

tower and telephone record evidence and the Government's arson expert; and (3) failing to sufficiently evaluate and advise Merritt of the strength of the Government's case and whether he should enter a plea agreement or proceed to trial and, if proceeding to trial, whether he should testify on his own behalf at trial. ECF No. 1784 at 4. None of these claims has any merit, and as such, the Court will deny the Petition. The Court will address each claim in turn.

In his first claim, Merritt argues that his trial counsel should have investigated and presented the testimony of the following five witnesses for his defense at trial: Larry Harcum (Lateef), Anthony Bennett (Ant), Jackie LaPortez, Marc Jennings, and Ovetta Merritt. *Id.* However, as the Government points out in its response, counsel's failure to call these witnesses at trial did not amount to constitutional ineffectiveness because "[t]he proposed witnesses and evidence Merritt proffers would either be cumulative or irrelevant, even assuming they are admissible." ECF No. 1794 at 38. Even Merritt in his Petition and its accompanying attachments is unable to confirm whether all five witnesses would have been willing to testify on his behalf at trial. *See* ECF No. 1784 at 18–21. Moreover, none of these five witnesses had personal knowledge of the firebombing or the events leading up to it, as all that Merritt proffers for each witness' testimony are various alleged statements by Lamont Lewis asserting that Merritt was not involved in the firebombing. *Id.* at 13–21. Such statements were made by Lewis before he started cooperating with the prosecution and consequently, would have provided little impeachment value and ultimately would not have impacted the outcome of Merritt's guilty verdict because Lewis openly admitted at trial that he had lied to various people about his involvement, and by extension, Merritt's involvement, in the firebombing prior to his cooperation with the Government in this case. *See, e.g.*, TT 4/2/2013 at 163–65, 190–91; TT 4/3/2013 at 4, 211, 235–36. Nonetheless, in an effort to thoroughly review Merritt's claims on the merits, the Court will examine the proffered

testimony of each potential witness.

Starting with Larry Harcum, he actually did testify at trial, as a defense witness for Kidada Savage. *See* ECF No. 1794 at 39; TT 4/23/2013 at 9–150. During his testimony, Harcum confirmed that Lewis admitted to committing the firebombing with someone else, thus strengthening Lewis' testimony and further incriminating Merritt as Lewis' accomplice. *See* TT 4/23/2013 at 16. Additionally, Harcum proved to be a terrible witness for the defense, as he "was exposed as a serial liar" on cross-examination, during which the Government revealed that he had committed numerous violent acts, was a convicted felon, and had lied about various aspects of his life. ECF No. 1794 at 39; *see* TT 4/23/2013 at 10, 63, 68–69, 79, 80, 86–90. In his Petition, Merritt alleges that "Larry [Harcum] would have testified that Lamont told him that [Merritt] had nothing to do with the firebombing, but Lamont had to add [Merritt] in order for the government to agree to give Lamont a 5k1 in his own case, where he was facing the death penalty." ECF No. 1784-1 at 5. However, habeas counsel's investigator was unable to reach Harcum to obtain an affidavit from him for Merritt's Petition, ECF No. 1784 at 18, and Merritt's bald assertion about what Harcum would have said at trial is insufficient to entitle him to an evidentiary hearing. In any case, Harcum's purported testimony would have been consistent with Lamont Lewis' own testimony that before he agreed to cooperate with the Government, he had lied to various individuals about the circumstances surrounding the firebombing. As such, there is no reasonable probability that the addition of Harcum's account would have had a significant effect on impeaching Lewis' trial testimony and, in turn, changed the outcome of Merritt's guilty verdict.

As to Anthony Bennett, Merritt claims that Bennett knew Bienvenido Morales, a prosecution witness who testified against Merritt at trial, and would have told the jury that Morales was not close to Merritt, thereby undermining Morales' testimony against him. ECF No. 1784-1

at 6. However, when habeas counsel's investigator contacted Bennett in connection with preparing this Petition, Bennett did not mention Morales at all and in fact explained that he never spoke with Lamont Lewis. ECF No. 1784 at 19. The extent of Bennett's knowledge about the firebombing, and in particular, Merritt's involvement or lack of involvement in the firebombing, all come from conversations that he allegedly overheard while incarcerated, from unspecified individuals and "another defendant named Calvin, also known as 'Cheesesteak.'" *Id.* Such hearsay would have been inadmissible at trial, and, even if admitted, would have had no effect on the evidence presented against Merritt at trial because Bennett has no personal knowledge about how the firebombing unfolded and no basis for his assertion that Merritt was uninvolved.

Turning to Jackie LaPortez and Ovetta Merritt, these two individuals are Merritt's family members and both of their affidavits reflect that their testimonies would have consisted of statements that Lamont Lewis allegedly made to them before he decided to cooperate with the prosecution. ECF No. 1784 at 13–17. LaPortez recounts that Lewsi told him "it was a shame that [Merritt] got involved with it, that he had nothing to do with it," *id.* at 13, and Ovetta states that Lewis swore to her shortly after the firebombing that Merritt was not involved in the terrible deed that he committed, *id.* at 15. Again, as previously explained, the impeachment value of these statements would have been negligible since they are wholly consistent with Lewis' own testimony at trial that he lied to his family members about the specifics of the firebombing in its aftermath and prior to his cooperation with the Government. And, as the Government notes in its response, Lewis' alleged statement to LaPortez that Merritt "got involved with it" even though "he had nothing to do with it" could be interpreted as Lewis expressing regret that Merritt ended up participating in the firebombing as an accomplice even though Merritt had no personal vendetta against Coleman. ECF No. 1794 at 40–41. Thus, LaPortez and Ovetta's testimonies would have

offered nothing new, and may have even been detrimental, to Merritt's defense at trial.

Finally, as to Marc Jennings, who is Merritt's half-brother, he told habeas counsel's investigator that he did not have any information to provide pertaining to this case. ECF No. 1784 at 21. Jennings clarified that "he never tried to contact [Merritt's] attorneys and all he knew about the case was what was reported on the news and in the newspapers." *Id.* As such, Jennings would not have proved useful to Merritt's defense at trial. For the reasons stated, none of the five potential witnesses identified in the Petition would have provided valuable exculpatory information that would have been reasonably likely to change the outcome of Merritt's guilty verdict. Thus, trial counsel were not ineffective for failing to sufficiently investigate and present these witnesses at trial.

Moving to Merritt's second claim, that his trial counsel failed to sufficiently investigate and counter the Government's cell tower evidence and the Government's arson expert, Merritt fails to explain how obtaining expert opinions to impeach the Government's arson expert and cell tower location evidence would have either undermined the prosecution's case against him or bolstered his defense in some way. *See* ECF No. 1784-1 at 8; ECF No. 1784-2 at 32. Merritt states that he "now understand[s] that the cell tower evidence was not advanced enough in 2004 to be able to specify where a person was located—it could not have shown that [he] was on one block or another during the time of the firebombing that Lamont Lewis committed. It could only indicate the general area where a person was during the time of a phone call." ECF No. 1784-1 at 8. However, these caveats regarding cell tower records were conveyed by the Government's own expert witness at trial, and no one testified that the cell tower records could "pinpoint the precise place where the phone was at any given time," just that "[c]ell tower records showed Merritt's phone traveling from Norristown to North Philadelphia in the hours before the arson murders

occurred." ECF No. 1794 at 42. So, further expert opinions on this matter would have been superfluous.

As for Merritt's claim that his trial counsel should have countered the Government's arson expert, he offers no basis for this contention and does not explain how counsel should have or even could have countered the arson evidence, or how doing so would have strengthened his defense. *See* ECF No. 1784-1 at 8; ECF No. 1784-2 at 32. Further, as the Government points out, "there was never any question that the fire at the Coleman house was the result of an arson" and "this was not a controversial or even contestable opinion." ECF No. 1794 at 42. As such, it is unclear how a defense expert would have been useful for impeaching the Government's arson expert. Merritt's second claim for ineffective assistance of counsel fails.

Lastly, Merritt's third claim is also meritless. While Merritt faults his trial counsel for failing to advise him of the strength of the Government's case and not encouraging him to enter into a plea agreement, ECF No. 1784-1 at 8, the Government has represented that "no plea offer was extended to Merritt," ECF No. 1794 at 42. Because a plea deal was never on the table, Merritt's trial counsel could not have been ineffective for not advising him to plead guilty to the charges against him. With respect to Merritt's argument that his counsel never discussed with him whether he should testify on his own behalf at trial, Merritt does not describe what his testimony would have been or explain how his testimony would have changed the outcome of the trial, especially in light of the substantial evidence presented against him to the jury. Thus, this third claim also fails.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Merritt's Petition for a Writ of Habeas Corpus (ECF No. 1784). Because the record is clear on the facts pertaining to the issues that Merritt

raises in his Petition, as discussed above, an evidentiary hearing is not necessary to resolve this case. No certificate of appealability will issue because Merritt has not made a substantial showing of the denial of a constitutional right under 28 U.S.C. § 2253(c)(2).

An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**